# EX'RS OF GOODMAN v. ADM'RS OF PLEDGER.

1. If a mortgagee uses the power his mortgage gives him over the mortgagor, to obtain the equity of redemption, at less than its value, and for less than others would have given for it, a court of equity will hold the transaction to be still a mortgage, and permit the mortgagor to redeem.

2. If the mortgagee, on the mortgage debt being tendered, refuses to deliver the property, a slave, and he afterwards dies, it is the mortgagee's loss.

Writ of Error to the Chancery Court of Shelby. Before the Hon. D. G. Ligon, Chancellor.

THOMAS GOODMAN filed his bill against the administrators of Pledger, alledging that in February, 1833, Pledger, at his request, advanced and loaned to him $377 49, and to secure the payment thereof, he placed in the possession of Pledger a valuable negro boy named Joe, about eighteen years old, to work for the interest of the money until paid, and on the payment of the money he was to be returned to complainant; and thereupon the complainant executed to Pledger a conveyance of said slave, conditioned, that if said complainant should punctually pay said sum of money, then said conveyance to be void; and that, pressed by necessity, he applied to Pledger for a loan of $123, which was also advanced to him, making in all $500, and which was less than one half of the value of the boy.

The bill further alledges, that at the time of receiving this last mentioned sum, complainant was induced to execute to Pledger an absolute bill of sale for said slave; Pledger assigning as the reason of his request, that he was about to go to Georgia, and did not wish the boy taken from him in crop time, but assured complainant, that he should have said boy at any time within five years, upon the repayment of the five hundred dollars; and it was understood and agreed, that it was not an absolute sale, but that the boy was pledged to

secure the five hundred dollars, and his services were to satisfy the interest. That at the time of executing said bill of sale, he was offered eight hundred dollars for the boy, by Thomas Brasier, and that he would not take it. That Pledger had departed this life, and James Pledger, his son, was appointed administrator, and that on the 28th day of October, he tendered to said administrator the sum of $500, and demanded said slave, which the administrator declined to receive, and refused to give up the boy. The bill prays an account, and that the administrator of Pledger be decreed to deliver up said boy. The bill was amended by adding an additional prayer, that the bill of sale be delivered up to be cancelled, and for general relief.

The answer of the administrator admits that complainant borrowed of his intestate the sum of $377 49, and to secure the payment thereof pledged the negro Joe, as stated in the bill, and that it was verbally agreed, that complainant might redeem him at any time within five years. This was in February, 1833, and in April following he obtained a futher loan of fifty dollars, and in May a further loan of thirty-four dollars in corn, the complainant refusing to sell the boy, expecting to obtain a pension by which he could be enabled to redeem him. That in November, complainant came to Pledger and offered to sell the boy for $550; this was refused, although complainant said he knew he could get $600 for him on a credit. A short time afterwards, Pledger, the intestate, sent a blank bill of sale to complainant, by his son, Thomas Goodman, with a verbal message, that he had two weeks to determine whether to refund the money or sign the bill of sale, which would give Pledger time to go to Georgia and buy another boy, if he had to give Joe up. The respondent went with T. Goodman, to complainant, and he said that he chose to sell, and they went to the clerk's office, and the bill of sale was executed, which was attested and dated by O. B. Farris, the clerk; and the respondent then paid to complainant the balance, making up the $500. The respondent denies that there was any promise to permit the complainant to redeem the boy, after the execution of the bill of sale.

The answer also denies that the respondent ever admitted

the right to redeem, after the death of the intestate, but admits the tender of the five hundred dollars, as stated in the bill.

After the answer came in, the complainant died, and also the defendant, who was the administrator of Pledger.

The suit was renewed in the name of the executors of Goodman, against the administrators *de bonis non* of Lemuel Pledger, the intestate, and by way of supplement to the bill of revivor, the death of the negro, Joe, is alledged.

The evidence which was taken is, so far as pertinent recited in the opinion of the court.

The chancellor at the hearing dismissed the bill, which is now assigned as error.

Morris, for plaintiff in error.

1. The mortgage executed in February, 1833, fixes the rights of the parties, which cannot be varied by parol evidence. It does not come within the exception that an absolute bill of sale may be converted into a mortgage by parol evidence. Brooks & Brown v. Maltbie, 4 S. & P. 96.

2. The equity of redemption cannot be barred by a subsequent agreement between the mortgagor and mortgagee, unless it be conducted with the utmost fairness. Holdridge v. Gillespie, 2 Johns. Ch. Rep. 30; Newcomb v. Bonham, 1 Vern. 8; Jennings et al. v. Ward et al. 2 Ib. 520; Mellor v. Lees, 2 Atk. 494; Goodman v. Grierson, 2 Ball & B. 138; 2 Sugden on Vend. 128; 1 Pow. on Mort. 124; Ib. 122, note; Clark v. Henry, 1 Cow. 331, and cases cited; 2 Vern. 418; Wrixton v. Colter, 1 Rdigw. 295.

3. The answer of Pledger, and the testimony of Lee & Wharton, coupled with the inadequate price given for the negro, clearly shows the bill of sale to have been obtained by unfair means, and it should be set aside. Holdridge v. Gillespie, 2 John. Ch. 30.

4. If the bill of sale be declared absolute, it must be set aside as unfair, and the original mortgage stand good. If a mortgage, the complainant has a right to relief.

5. The money due on the mortgage was tendered during the life of the negro mortgaged, and before the filing of the bill, or at least before the filing of the supplemental bill. A

refusal on the part of Pledger's administrator to receive the money, or surrender the negro, put the latter at the risk of the defendant.

6. The inadequate price given, the testimony of Needham Lee, Jesse Wharton, and T. Goodman, is quite sufficient to show that the whole transaction was intended to operate merely as a mortgage.

7. Thomas Goodman is a competent witness; being the son-in-law of Pledger, his interest is balanced.

S. F. RICE, contra.

1. If the allegations of the bill show, that the apparent sale of the slave to the defendant, Abner Hughes, was really a mortgage, these allegations also show, that there could not be, and that there was not in fact, any default in the condition, and that the mortgage was fully paid off by the hire of the slave, before default, and before the death of the mortgagor. Under such circumstances, the action of detinue was a complete remedy for the administrator of the mortgagor, and a bill in chancery against the mortgagee, cannot be sustained—especially when the person who is administrator files the bill as a distributee, and shows no excuse for not suing at law, in his character of administrator. Deshazo v. Lewis, 5 Stew. & Por. Rep. 91; Chambers et al. v. Maulden et al. 4 Ala. Rep. 477; Robinson v. Robinson, 11 Ib. 947.

2. If the transaction in relation to the slave, is shown by the bill, or by the proof, to be merely a pledge of the slave, to pay the debt of $100 by his hire, there can be no relief in equity, especially on a bill filed by one as distributee, who is also administrator of the deceased pledgor. The legal title of the property pledged would be in the administrator, and he should have sued in his representative character, whether he sued at law or in chancery. The settlement in the orphans' court does not destroy his rights as administrator. Brasher v. Williams, 10 Ala. Rep. 630; Robinson v. Robinson, 11 Ib. 947; Gayle v. Elliott, 10 Ib. 265; Carroll v. Moore, 7 Ib. 618; Reynolds v. Reynolds, 11 Ib. 1023; Skinner v. Frierson, 8 Ib. 918.

3. The complainant is estopped and barred from asking any relief, by his conduct as administrator. He administer-

ed on and settled the estate, without pretending that the slaves belonged to the estate, and he did this with a full knowledge of all the facts. McLane v. Spence, 6 Ala. 894; Jefford's adm'r v. Ringgold, Ib. 548.

DARGAN, J.—The mortgagor of property, real or personal, may sell, or otherwise dispose of the equity of redemption, and the law does not render the mortgagee incapable of purchasing from him. The mortgagor therefore, has the right to sell, and the mortgagee the capacity to buy the equity of redemption. But the principle is settled, and we think in accordance with strict morality, that if the mortgagee use the power his mortgage may have given him, to obtain the equity of redemption at less than its value, and for less than others would have given for it, a court of equity will hold the transaction a mortgage, and permit the mortgagor to redeem. See 2 John. Ch. Rep. 30; 5 Gill & John. 75; 2 Sch. & Lef. 673; 1 Ball & Bea. 164; 1 Powell on Mort. side page, 155, and note, N.

The question then for the chancellor to ascertain, when the mortgagor seeks to redeem, after an absolute sale to the mortgagee of the equity of redemption, is, has the mortgagee used his mortgage for the purpose of coercing the mortgagor to sell him the equity of redemption for less than its value, and for less than others would have given, at a fair sale, and if the chancellor find that such influence was used, in the purchase of the equity of redemption, and that this influence produced the results described, that is, benefit or advantage to the mortgagee, and prejudice to the mortgagor, by selling his right to redeem for less than its value, and less than others would give for it, then he ought to interfere, and hold that the mortgagor may still redeem.

We will now test the record and the evidence by this rule. The answer shows, that Lemuel Pledger, the intestate loaned to Goodman, $377 49, and to secure which the mortgage was executed, bearing date the 21st February, 1833, and the negro was placed in the possession of Pledger, and his labor was to compensate for the interest. Also, that it was agreed by parol, that Goodman might return the money at any time within five years, and take back the boy. That between the

date of the mortgage and the execution of the bill of sale, which was executed the 1st of December, 1834, Pledger had further advanced about $80, but the answer does not disclose on what terms this further advance was made. Pledger had a blank bill of sale prepared and it was sent to Goodman, with this message, that he had two weeks to determine whether he would refund back the money loaned to him, or to execute the bill of sale.

The testimony of Lee is, that some short time after Pledger got possession of Joe, he stated to the witness, that he was to let Goodman have as much as $500, most of which, say $350 or $400, he had already furnished, and that he was to have the boy's services until the money was refunded, and that Pledger said he did not expect Goodman would ever refund the money; that in the latter part of 1834, or the early part of 1835, Pledger had a bill of sale for Joe drawn up, and requested the witness to go with Thomas Goodman, who was the son-in-law of Pledger, and the son of the mortgagor, to the old man to get him to sign it; that if he could get him to sign that bill of sale, that he would have him fixed, or be too fast for him. Witness did not go, but on the return of young Goodman, Pledger told him that he had got the business fixed to his liking. This witness estimates the value of Joe in 1835, at $1,000, and his services at $100 a year.

Jesse Wharton states, that in 1833, he heard Pledger say that he had got the boy of Goodman; that he was to work for the use of the money; that he let Goodman have some money, and was to let him have enough to make up five hundred dollars in all, for the use of the negro; that when Goodman paid back the money, he was to have the boy, but was not to take him in crop time. Heard Pledger say he had got a new mortgage, or deed of trust for Joe, and had let Goodman have the $500; that when he returned the money, that Goodman, or any of his children, should have him back, but no one else should have him for that price. The negro in 1835 was appraised at $1,000, but would have sold for $1,200.

The answer also alledges, that the mortgagor was old, and without the means of redeeming at the time, and relied on

obtaining a pension to enable him to redeem. Under the circumstances disclosed by the answer, and these two witnesses, disregarding all others, we feel bound to declare the bill of sale of December, 1834, a mortgage.

We think the testimony of Lee and Wharton establishes that the contract originally was, that Pledger was to lend Goodman $500, and that he was to receive the negro, whose labor was to compensate for the interest ; and the answer shows, that it was understood at the time of entering into the original contract, that Goodman might refund the money at any time within five years, and take back the boy. In December, 1834, and before all the $500 was advanced, a bill of sale was prepared by Pledger, and sent to Goodman, without any previous agreement to this effect, with a message, that he had two weeks to determine, whether he would refund the money, or execute the bill of sale. Goodman was without the means of paying back the money, and this demand, which does not seem to have been authorized by any previous dealings, being made on him, he chose to execute the bill of sale. When it was done, Pledger said he was then fast enough for him, or words to that effect.

Under this proof, we think that Pledger was very anxious to obtain the absolute title ; that he used the power his mortgage gave him over a necessitous mortgagor, to obtain the equity of redemption at much less than its value, and it is therefore the duty of the court, in accordance with the well settled rules of equity, to declare the bill of sale a mortgage, and to permit it to stand as a security for the amount of money actually lent to the mortgagor, or advanced on his account, and which is shown by the answer to be $500.

The negro is dead, but the answer of James Pledger, the administrator, admits the demand of the negro, and the tender, and refusal of the mortgage money, and says nothing about the death of the negro at that time. We are therefore constrained to hold, that the demand of the negro, and tender of the money, was made whilst the negro was alive, and his

death therefore must be the loss of him who wrongfully with-held him from the owner.

The decree must therefore be reversed, and the cause re-manded, for further proceedings in accordance with the law as here expressed.